SOUTHWESTERN GAS & ELECTRIC CO. *v.* CITY OF HATFIELD.

4-9523                                      243 S. W. 2d 378

Opinion delivered November 12, 1951.

516

*Hal L. Norwood, Townsend & Townsend* and *Arnold & Arnold*, for appellant.

*Bobby Steel* and *Louis Tarlowski*, for appellee.

MINOR W. MILLWEE, Justice. This is an appeal from a judgment of the Pulaski Circuit Court entered on review of an order of the Arkansas Public Service Commission, hereinafter called "Commission." Appellants are Southwestern Gas & Electric Company and Rich Mountain Electric Cooperative, Inc., hereinafter called respectively, "Southwestern" and "Rich Mountain." Appellee is the town of Hatfield, Arkansas, hereinafter called "Hatfield."

Since 1927 Southwestern has owned and operated electric distribution systems in the towns of Hatfield and Cove, Arkansas. On March 25, 1950, appellants filed with the Commission their joint application for an order authorizing Southwestern to sell the distribution systems in said towns to Rich Mountain under an agreement which stipulated that it should be subject to prior approval of the Commission and the town councils of Hatfield and Cove. Following a hearing before the Acting Chairman of the Commission on May 25, 1950, the matter was taken under advisement. On June 8, 1950, the Commission entered an order approving the proposed sale as being in the public interest and reciting, ". . . the record reflects that both towns have acquiesced in the transfer."

Hatfield was not represented at the hearing on May 25, and on June 20, 1950, filed a petition with the Commission alleging that ninety percent of the citizens of the town opposed the sale; that such opposition had been noted by proper resolution of the town council opposing the sale, notice of which action had been filed with the Commission prior to the hearing; that J. M. Stephenson, manager of Rich Mountain, had subsequently, by misrepresentation, persuaded at least two members of the council to sign a paper which they did not understand; and that by reason of such misrepresentation the Commission had approved the sale. Prayer of the petition was that the Commission grant a rehearing and give Hatfield an opportunity to present its objections to the proposal, and that the application of appellants be denied. The town of Cove apparently acquiesced in the proposed sale.

On July 14, 1950, the Commission entered an order directing that its order of June 8 be held in abeyance until such time as additional testimony might be taken. This order recites: "At the time of the hearing, the Commission, as the record will reflect, was informed that the citizens of the Cities had no objection to this transfer. The Commission further requested that the Cooperative furnish documentary proof that such was the case. Such proof was forthcoming for the City of Hatfield in the form of individual letters filed by Councilmen for that City. However, on June 20, 1950, the Commission received a petition from the City of Hatfield which, through its allegations, cast doubt in the minds of the Commission as to whether or not the information elicited at the hearing and thereafter was conclusive as to the position of the citizens of the City of Hatfield."

On August 9, 1950, the Commission held a hearing on the petition filed by Hatfield and again took the matter under advisement. On August 29, 1950, the Commission entered an order denying the petition of Hatfield and confirming the order of June 8, 1950. This order contained a finding as follows: "On March 21, 1950, the Town Council of the town of Hatfield, Arkansas, was

duly assembled in a called meeting at which time the Southwestern Gas & Electric Company was represented by Mr. C. L. Leighton and the Rich Mountain Electric Cooperative, Inc., was represented by Mr. Jim Stephenson. The matter of the sale of the electric distribution system was presented to the Town Council, and Mr. Leighton and Mr. Stephenson were dismissed from the Council Chambers and returned a short time later and were advised that the Town Council had voted their approval of such sale; under date of March 22, 1950, a letter was written to the Public Service Commission advising this Commission of the action of the Town Council and was signed by Mr. Kermit Myers, as Mayor, and Mr. Harold Faulkner, as recorder, which says that a unanimous vote in favor of the sale was had and no protest would be offered; that there was no fraud practiced upon the Town Council or any member thereof to obtain this resolution and agreement; that the meeting constituted a called meeting of the Town Council; that all members of the Town Council were present and took part in the meeting.''

On September 2, 1950, Southwestern filed application for rehearing and amendment of the order of August 29, and on September 5 Hatfield also applied for a rehearing. The Commission overruled Hatfield's petition, but Southwestern's application for amendment of the order of August 29 was granted. This amendment was to the effect that Southwestern had a legal right to sell the properties without liability of any nature to it and that upon consummation of said sale, Southwestern should be relieved of all contracts, obligations and duties it then had or could have with respect to the two towns and the inhabitants thereof.

On September 18, 1950, Hatfield filed a petition in circuit court pursuant to Ark. Stats., §73-233 for review and vacation of the Commission's final order. The petition alleged that the Town Council of Hatfield had not approved the proposed sale but had expressly disapproved same, that the alleged council meeting of March 21, 1950, was not, and did not purport to be, a legal coun-

cil meeting, but was informally held for the purpose of hearing explanation of the proposed sale and not for the purpose of taking final action thereon; that any expressions coming from said meeting for or against the proposal were not made as, and did not purport to be, the action of a legal meeting of the council; that, even if said meeting was valid, the results thereof were abrogated and superseded by a resolution opposing the sale which was duly adopted at a valid meeting of the council on April 21, 1950. In separate responses to the petition by the Commission and Southwestern, the latter specifically requested the court to adjudicate the matter of whether the town council of Hatfield had approved the contract between Southwestern and Rich Mountain.

The able trial judge made extensive findings which were incorporated in the judgment dismissing the petition of Hatfield and confirming only that part of the order of the Commission entered on June 8, 1950, which approved the sale as being in the public interest. In reaching this conclusion the court found: "The case under consideration here involves, (1) a contract between seller and purchaser; (2) a contract between Hatfield and Southwestern; and, (3) the legality of the action of the Hatfield Council. These are questions to be determined by a Court of competent jurisdiction and not by the Public Service Commission.

"By its petition filed in this Court on September 18, 1950, Hatfield undertakes to have the order of the Public Service Commission disposing of the above questions, contrary to the contentions of Hatfield, set aside. A review of the authorities cited above leads to the conclusion that this Court does not have jurisdiction, and that the Public Service Commission was without jurisdiction in the first instance to pass on any question other than whether the proposed sale would be in the public interest."

In view of the disposition we make of the case, we find it necessary to decide only the question of the Commission's jurisdiction to determine whether the town council of Hatfield validly approved the proposed sale.

In deciding that the Commission was without jurisdiction to determine the validity of the action of the Hatfield council, the trial court held that such determination involved the exercise of judicial powers and functions, while the Commission was only competent to exercise legislative or administrative powers. The court cited the following cases as a basis for this conclusion: *Jones* v. *Cooper,* 154 Ark. 308, 242 S. W. 550; *St. L.-S. F. Ry. Co.* v. *Mo. Pac. Rd. Co.,* 156 Ark. 259, 245 S. W. 806; and *City of Fort Smith* v. *Dept. of Public Utilities,* 195 Ark. 513, 113 S. W. 2d 100. None of these cases involved the question of the sale of a utilities system. The instant proceeding was brought pursuant to Ark. Stats., § 73-253, which requires the consent of the Commission as a prerequisite to the proposed sale and authorizes a public hearing before that body to determine whether the proposal is consistent with the public interest. The gist of the holdings in the above cited cases is that the functions of the Commission are legislative or administrative in character although its decisions are *quasi*-judicial in the exercise of the powers conferred for the general purpose of regulating and controlling public utilities.

In *City of Fort Smith* v. *Department of Public Utilities, supra,* this court quoted with approval from the case of *Prentis* v. *Atlantic Coast Line Co.,* 211 U. S. 210, 29 S. Ct. 67, 53 L. Ed. 150. In that case it became necessary to determine whether the Virginia State Corporation Commission was acting in a legislative or judicial capacity in promulgating railroad rates. Justice Holmes said: "A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power. The establishment of a rate is the making of a rule for the future, and therefore is an act legislative, not judicial, in kind, as seems to be fully recognized by the supreme court of appeals. . . .

". . . And it does not matter what inquiries may have been made as a preliminary to the legislative act.

Most legislation is preceded by hearings and investigations. But the effect of the inquiry, and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up. A judge sitting with a jury is not competent to decide issues of fact; but matters of fact that are merely premises to a rule of law he may decide. He may find out for himself, in whatever way seems best, whether a supposed statute ever really was passed. In *Pickering* v. *Barkley,* Style, 132, merchants were asked by the court to state their understanding as an aid to the decision of a demurrer. The nature of the final act determines the nature of the previous inquiry. As the judge is bound to declare the law, he must know or discover the facts that establish the law. So, when the final act is legislative, the decision which induces it cannot be judicial in the practical sense, although the questions considered might be the same that would arise in the trial of a case."

In 42 Am. Jur., Public Administrative Law, § 38, the rule is stated as follows: "The distinctive character of a proceeding or act of legislative or judicial is imparted by the nature of the final act and the character of the proceedings, rather than the character of the body conducting the proceedings."

The Commission was established by the Legislature to act for it, and has the same power the Legislature would have, when acting within the power conferred by the Statute (Ark. Stats., § 73-101, *et seq.*). *Department of Public Utilities* v. *The Arkansas-Louisiana Gas Co.,* 200 Ark. 983, 142 S. W. 2d 213. The nature of the final act of the Commission in the instant case was the determination of the question as to which supplier should in the future own and operate the electric distribution systems in the towns of Hatfield and Cove. We think this is manifestly a function which the Commission was authorized by the Legislature to determine. In making such determination the Commission may consider and determine questions of law, or mixed questions of law and fact, where such questions are germane and incidental to the final legislative act. Now the question whether the

town council of Hatfield validly approved the sale is a mixed question of law and fact. But a determination of the question was a necessary step in a legislative or administrative proceeding leading up to and culminating in the final legislative act. The Commission's determination of the question is subject to review by the courts. Orderly procedure and administrative efficiency demand that the regulatory body be vested with authority to make preliminary determination of legal questions which are incidental and necessary to the final legislative act. Otherwise endless confusion would result because different phases of the same case might be pending before the Commission and the courts at one time. *St. Clair Borough* v. *Tamaqua & Pottsville Elec. Ry. Co.,* 259 Pa. 462, 103 A. 287, 5 A. L. R. 20; *State ex rel. Cirese, et al.* v. *Ridge, Presiding Judge,* 345 Mo. 1096, 138 S. W. 2d 1012. It is our conclusion that the Commission had jurisdiction to determine whether the town council of Hatfield approved the sale in question and that the trial court erred in holding otherwise.

This brings us to a consideration of the correctness of the Commission's finding that Hatfield approved the proposed sale. The matter of supplying electric energy to a community is one of vital concern to its inhabitants. Unless there is substantial evidence to support a conclusion that the town council of Hatfield clearly and definitely approved the sale, the Commission's order should not be allowed to stand. Testimony of council members at the hearing on August 9, 1950, was that they opposed the proposed sale because a great majority of Hatfield citizens had expressed their opposition to the proposal by petition to the council, and for other express reasons; that no resolution was introduced or passed at the meeting on March 21, 1950, and no vote taken; that no minutes were kept of the meeting; and that some members expressed approval of the sale while others disapproved. The next day the mayor and the recorder signed a letter to the Commission stating that the council had adopted a motion by unanimous vote approving the sale. After a majority of the citizens of the town filed a petition with the council op-

posing the sale, another special meeting was called and held on April 21, 1950, at which a resolution was adopted by unanimous vote opposing the sale, but there is some question as to whether one absent member had been properly notified of the meeting.

Equally clouded is the question whether all members were present at the first meeting on March 21. In answer to a question as to the number present, one member of the council stated that all were present, another stated that he did not believe he was there, while a third member was uncertain on the matter. In this connection J. M. Stephenson, Manager of Rich Mountain, testified as follows in regard to the March meeting: ''Mr. Myers was the mayor at the time, and they were a little late in getting started. Some of them came in late, and I think everybody was there except Mr. Sandlin, and he said, well, we are all here except Mr. Sandlin. Someone said they thought he was sick and probably wouldn't be here, and they might as well call the meeting to order and get started, so he called Mr. Leighton first and he got up and explained the deal to them and then I told them our position in the thing. Then we were asked questions and then Mr. Leighton suggested we go outside until they took action.'' Mr. Stephenson also testified at the first hearing on May 25 that one council member was absent from the March 21 meeting on account of sickness. Mr. Sandlin did not testify at the hearing on August 9, but it was stipulated that he and another absent member of the council would, if present, testify that they were opposed to the transfer.

At the conclusion of the first hearing on May 25, 1950, the Acting Chairman of the Commission, having been apprised of the apparently conflicting council actions, requested Mr. Stephenson to attempt to secure either a resolution from the council or one signed by the majority of its members. In response to this request, Mr. Stephenson drafted and obtained the signatures of four members of the council to four separate but identical letters dated May 26, 1950, stating that the member had opposed the sale in order to protect the citizens of Hatfield against certain specified losses. Each letter concluded: ''As

long as the Public Service Commission has been satisfied that these losses will not occur, and that the electric service to our community will be improved, I have no objections to the sale.'' At a council meeting on May 30, 1950, a motion was unanimously adopted to employ counsel to represent the town in opposition to the proposed sale and this was done.

Special meetings of a town council are legal meetings where all of the members are present and participate in the meeting, or where there has been a compliance with all conditions precedent to such meeting if only a quorum is present. *Harrison* v. *Campbell*, 160 Ark. 88, 254 S. W. 438; *Carpenter* v. *City of Paragould*, 198 Ark. 454, 128 S. W. 2d 980. There was no compliance with the requirements as to call and notice of the special council meeting on March 21, 1950. When the testimony in the whole record is considered, we also conclude that substantial evidence is lacking to support a finding by the Commission that all members were present and participated in the meeting. It follows that the town council of Hatfield has not validly consented to or approved the proposed sale.

We cannot agree with appellants' further contention that Hatfield is estopped to deny the validity of the meeting of March 21, 1950. J. M. Stephenson stated that he made arrangements for funds to consummate the purchase and made a trip to Washington in connection with the proposal. The evidence is vague as to the extent of such arrangements and this was done several weeks before the matter was heard by the Commission. This was insufficient to work an estoppel as against Hatfield.

Hatfield has cross-appealed from that part of the judgment finding the proposed sale to be in the public interest. The testimony of all the witnesses who testified on this point is to the effect that the proposed transfer of properties would be in the public interest. The conclusion of the Commission is amply supported by the evidence and the trial court correctly so held.

The judgment of the circuit court is accordingly affirmed on the cross-appeal. On direct appeal the judg-

ment is reversed and the cause remanded to the circuit court with directions to set aside the Commission's order approving the sale and to remand the cause to the Commission for further proceedings not inconsistent with this opinion.

The Chief Justice concurs.