ARKANSAS ELECTRIC COOPERATIVE CORPORATION *v.*
ARKANSAS-MISSOURI POWER COMPANY.

4-9847                                                                   255 S. W. 2d 674

Opinion delivered February 23, 1953.
Rehearing denied March 30, 1953.

*Fitzhugh & Cockrill,* for appellant.

*P. A. Lasley, House, Moses & Holmes, Herbert L. Branan, Rainey, Flynn, Green & Anderson, Wallace*

*Townsend, Richard L. Arnold, O. D. Longstreth, Jr., Dave E. Witt* and *Joseph Brooks,* for appellees.

GEORGE ROSE SMITH, J. This is an application by Arkansas Electric Cooperative Corporation (Arkansas Electric) for a certificate of convenience and necessity by which Arkansas Electric would be authorized to construct a 30,000 kilowatt (KW) steam-powered generating plant near Ozark, Arkansas, and 544 miles of sixty-nine kilovolt (69 KV) transmission lines. The application is opposed by four intervening private utility companies and by two labor organizations. After hearings extending over a period of several months the Public Service Commission, by a vote of two members to one, granted the requested certificate. On appeal its action was reversed by the Pulaski Circuit Court, which adopted the views expressed by the dissenting commissioner.

Arkansas Electric is a federated cooperative formed by representatives of three distribution cooperatives which are engaged in the business of supplying electric power to their members in western Arkansas. Arkansas Electric, as well as its component cooperatives, was organized under the Arkansas Electric Cooperative Corporation Act, being Act 342 of 1937, Ark. Stats., 1947, §§ 77-1101 *et seq.* Heretofore the distribution cooperatives have purchased their power from one or more of the intervening utilities.

Arkansas Electric was created for the purpose of building the proposed steam generating plant and transmission lines. Having no funds of its own it intends to accomplish its objectives by means of contracts which it has made with two federal agencies, the Rural Electrification Administration (REA) and the Southwestern Power Administration (SPA). REA is an agency of the Department of Agriculture, created by 7 U. S. C. A., §§ 901 *et seq.* SPA is an agency of the Department of Interior created by executive order of the Secretary.

The various contracts which Arkansas Electric has with REA, with SPA, and with its own component cooperatives were all made with reference to one another

and together form a comprehensive plan for the construction and operation of the generating plant and transmission lines. REA has agreed to lend Arkansas Electric $10,558,000, which will be used to build the proposed facilities. This loan is to be repaid over a period of thirty-five years.

It is shown by the record that the present demands of the members of the three distribution cooperatives involve the consumption of only about a third of the power that can be produced by a 30,000 KW generating plant. There is evidence, however, that by 1959 the demands of these consumers will have increased to approximately the capacity of the plant. In the meantime the plant cannot be economically operated merely to serve the three component corporations, since the overhead expense would be so great that the cost of the power would be far in excess of the figure at which the cooperatives can buy energy from the intervening companies. And even if the needs of Arkansas Electric's consumers were today equal to the output of the proposed plant it is admittedly undesirable for a supplier of power to depend upon a single generator, since interruptions of service will unavoidably occur as a result of breakdowns, necessary maintenance, etc. In fact, it is not contended by Arkansas Electric that the project would be either economically feasible or in the public interest if its sole purpose were to supply the present needs of the three distribution cooperatives.

SPA's participation in the project is intended to meet the objections just mentioned. SPA, being already engaged in the sale of electricity and being in control of an extensive system of high voltage transmission lines, is in a position to market that part of the plant's production not needed by the component cooperatives. Moreover, SPA has at its disposal tremendous quantities of hydroelectricity generated at dams built by the United States; so SPA need not fear outages resulting from temporary shutdowns of the steam plant.

Arkansas Electric and SPA have entered into two contracts, referred to as the power contract and the lease

contract. Both agreements recite SPA's desire to obtain "the benefits . . . arising out of the integration of steam generated power and energy with its hydro power and energy." To this end the contracts simply incorporate the steam plant and transmission lines into SPA's present hydroelectric system. By the power contract Arkansas Electric agrees to sell to SPA the entire output of the steam plant for a period of forty years. SPA agrees to pay in monthly installments a minimum of $900,000 a year for the plant's output, it being broadly true that the minimum payments must be made whether or not the plant is actually operated or produces any electricity. By the contract SPA obtains in practical effect complete control of the plant for forty years. It is given the right to decide when and how the plant shall be operated, how much power shall be produced, how the records shall be kept, etc. Arkansas Electric's principal duty will be to operate the plant in obedience to SPA's instructions.

In addition to making the minimum annual payments SPA agrees to supply the present demands of Arkansas Electric's consumers and to meet their future demands if SPA "has available such additional power capacity." These sales are to be made at SPA's Rate Schedule A—a rate tentatively approved by the Federal Power Commission and subject to revision by that body. All other power generated by the plant may be sold by SPA to other customers of its own.

By the lease contract Arkansas Electric leases to SPA for forty years the 544 miles of 69 KV transmission lines, these lines to be completely maintained and controlled by SPA. The rental is not fixed in dollars and cents but is to be so calculated that it will exactly repay that part of Arkansas Electric's REA loan that is allocable to the transmission lines. SPA has the option at any time of purchasing the lines by paying the remaining REA balance so allocable to the lines. In the event of such a purchase SPA is relieved of any duty to reserve transmission capacity to meet increased demands of Arkansas Electric's consumers. If SPA has

not bought the lines before the expiration of the lease it may then do so for ten dollars. Thus it will be seen that the lease contract is in substance an installment sale of the property to SPA. Both the power contract and the lease are conditioned upon the making of federal appropriations to discharge SPA's obligations, and SPA is relieved of all liability if Congress should ever fail to make such appropriations.

We have attempted to state only the broad outline of these agreements, each of which is a long and technical document. Much is made in the briefs of various options to cancel, fuel clauses, ratchet provisions, and other details that we do not regard as essential to the decision of what we consider to be a relatively simple case.

At the hearings before the Commission Arkansas Electric offered a great deal of evidence to show that this State has an inadequate supply of electric power, that additional generating facilities are needed in the region to be served by Arkansas Electric, that the cost of the proposed facilities will not exceed the amount of the REA loan, and that the end result will be cheaper electricity than that now supplied by the intervening utilities. The latter adduced an imposing volume of proof to rebut the applicant's contentions. The majority members of the Commission decided the fact questions in favor of Arkansas Electric.

It is insisted by the appellees that many of the Commission's findings of fact are contrary to the undisputed proof, but we find it unnecessary to determine these issues. In our opinion the case is controlled by either of two independent issues of law: First, under the Arkansas statutes can Arkansas Electric legally sell power to SPA? Second, under federal legislation can SPA legally bind itself to the performance of its contracts with Arkansas Electric? The Commission expressed the view that both questions should be answered in the affirmative.

Despite the fact that these two inquiries are judicial questions they are properly raised in this administrative proceeding. The Commission must often determine questions of law that are pertinent to its final legislative decision. *Southwestern Gas & Elec. Co.* v. *City of Hatfield,* 219 Ark. 515, 243 S. W. 2d 378. The basic issue is that of public convenience and necessity, which has been described as "what will conduce to the general public welfare." *Abbott* v. *Public Utilities Com'n,* 48 R. I. 196, 136 A. 490; see also *Ark. Express, Inc.* v. *Columbia Motor Transport Co.,* 212 Ark. 1, 205 S. W. 2d 716. If the entire arrangement between Arkansas Electric and SPA is contrary to law, if the proposed construction is vulnerable to being halted at any time by reason of its being illegal, the public interest demands that the project not be undertaken. Of course Arkansas Electric counts on the expected revenue from SPA for assistance in the discharge of the REA loan, but if that source of income should be withdrawn the burden of meeting the indebtedness falls upon the members of the three component cooperatives. The public welfare would not be furthered by permitting these cooperatives to assume the burden of an undertaking that might at any moment become a complete loss to every one concerned. It is evident that the two issues we have mentioned are inherent in any consideration of the ultimate question of the public convenience and necessity.

*First:* Do the Arkansas statutes authorize Arkansas Electric to sell its electricity to SPA? The language of our rural electrification legislation is so completely free from ambiguity that this question can be answered only in the negative. Section 4 of Act 342 (Ark. Stats., § 77-1104) permits a cooperative to transmit, distribute, sell, furnish, and dispose of electric energy "to its members only." Section 12 (§ 77-1112), defining eligibility for membership, reads: "All persons in rural areas proposed to be served by a corporation, who are not receiving central station service, shall be eligible to membership in a corporation. No person other than the incorporators shall be, become or remain a member of a

corporation unless such person shall use or agree to use electric energy or, as the case may be, the facilities, supplies, equipment, and services furnished by a corporation. A corporation organized under this act may become a member of another such corporation and may avail itself fully of the facilities and services thereof.''

The statute could hardly be more explicit in its declaration that a cooperative can sell power to its members *only* and that its membership is limited to persons in rural areas who agree to *use* electric energy. The legislative design is evidently to bring the advantages of electricity to farmers and to residents of communities having a population of not more than 2,500. § 77-1102 (8). This interpretation has been uniformly followed by the Commission, for since the inception of the rural electrification program it has adhered to a policy of assigning rural territory either to a cooperative exclusively or to a private utility exclusively. We are told that heretofore neither has attempted to invade the other's province. We too have recognized the legislature's dominant intention, by our holding that a cooperative's right to serve an area terminates upon its annexation by a city of the designated size. *Farmers Elec. Coop. Corp.* v. *Ark. P. & L. Co.*, 220 Ark. 625, 249 S. W. 2d 837.

SPA is a ''person'' within the statutory definition, § 77-1102 (5), but there its eligibility to membership ceases. SPA is not in a rural area, it is not without central station service, and it does not propose to use this power as a consumer. To the contrary, SPA's Administrator testified below that he intends to resell this power to cities and towns, to large manufacturing concerns, and to any one else who buys power ''in wholesale quantities''—a term which the witness considered not restricted to wholesale, as distinguished from retail, transactions. Furthermore, SPA expects to number among its customers persons and municipalities who are already being served by the intervening utilities. In short, the effect of the SPA-Arkansas Electric alliance will be the sale of cooperatively generated power to persons not in rural areas, to persons who are receiving

central station service, and, in the case of SPA itself and its municipal patrons, to persons who propose not to use the energy as consumers but to resell it at wholesale or retail. We think it too plain for argument that the proposal violates not merely the letter of the law but its spirit as well.

Arkansas Electric does not intimate that any express language in the statute qualifies SPA for membership in a cooperative, but it is insisted that since the Act is to be liberally construed, § 77-1135, the project should be approved either as being incidental to Arkansas Electric's effort to serve its component corporations or as merely involving the disposal of surplus power. Neither argument is tenable. Liberal construction comes into play when the statute is silent upon a particular point or when the legislative intent is not easily ascertainable. Here there is neither silence nor uncertainty. Those to whom a cooperative may sell its wares are described in language too specific to be misunderstood. We are not authorized to press liberality of construction to the point of actually amending the statute.

Nor do these contracts involve the mere disposition of a surplus, as was the situation in *McGehee* v. *Williams*, 191 Ark. 643, 87 S. W. 2d 46. What Arkansas Electric proposes to do is to sell its entire output to SPA for forty years and to sell its transmission lines to SPA outright. The generating plant would have a capacity of triple the present needs of Arkansas Electric's legitimate consumers, and the 69 KV transmission lines would have a carrying capacity of more than four times the future needs of those consumers, under even the most optimistic estimates of future growth. In truth, if there is here any sale of surplus power it lies in the resale by SPA to Arkansas Electric, since the bulk of the power must evidently be sold elsewhere.

*Second:* Has Congress authorized SPA to acquire a source of steam-generated power and to integrate that power into its own hydroelectric system? To answer this question we must study in some detail the history of federal hydro power.

This power is generated at dams which were built for the dual purpose of flood control and the production of electricity. It has been the practice of the Corps of Engineers, in recommending to Congress that a certain dam be authorized, to propose a multi-purpose dam only if the sale of its electric energy could be expected to repay that part of the costs of construction allocable to the structure's function as a source of power. *Cf.* 16 USCA § 590z-1 (a, v). In other words, when the Corps has been able to say that the use of the dam for the generation of electricity, in addition to its use for flood control, would pay for itself, a multi-purpose dam has been recommended; otherwise not.

Thus in each instance it has been necessary for the Corps to estimate the price at which the hydro power could be sold in a competitive market. In making this estimate the Corps had to take into account the fact that hydro power, in competing with steam power, has at once a marked advantage and a marked disadvantage.

The advantage of steam power lies in its dependability as a source of what is called "firm" power in the industry. The owner of a 30,000 KW steam plant knows that except for breakdowns and other necessary interruptions he can operate his plant night and day and can supply his customers at any time with the maximum amount of electricity that the plant can generate. The proprietor of a hydroelectric plant does not have this same assurance, for his ability to supply firm power depends upon weather conditions. In times of abundant water he can deliver the full capacity of his generators, but during a drought he must operate at a reduced schedule to conserve his water supply. In this respect SPA is under yet an additional handicap, for the upper levels of its reservoirs must be ready to receive flood waters, flood control being a primary purpose of the dams. Hence SPA cannot keep its reservoirs bankful the year around, to the detriment of flood control. Consequently SPA might be able to produce at times a maximum of 25,000 KW of hydroelectric power and yet not be able to contract safely for the delivery of more than 5,000

KW of firm power throughout the year. Herein lies the great disadvantage of hydro power.

On the other hand, hydro power enjoys an advantage denied to steam power. This advantage derives from two facts: One, electricity cannot be stored once it has been created, and, two, the demands of consumers are not uniform throughout the year or even throughout the day. A householder may need only a trickle of electricity at night, to run his refrigerator and his clocks, but a few hours later he may consume quantities of electricity for lighting, heating, and cooking. As a result a supplier of power invariably has periods of peak demand and periods of minimum demand. Yet, because electricity cannot be held in storage, the supplier must have available enough power to satisfy the maximum demands of his patrons, even though he may be called upon for that maximum for only thirty minutes during the day, month, or year.

It is here that the producer of hydro power enjoys his advantage in the competitive market. The owner of a 100,000 KW steam plant is limited to the acquisition of customers whose peak demands will not at any moment exceed the capacity of the generator. But as business increases the supplier reaches a point at which he can meet all his customers' needs except in the short intervals of maximum demand. In the absence of an outside source of electricity the supplier would be forced to install another generator, which might operate so rarely that the additional power so generated would be extremely expensive. This additional power, called for only in periods of maximum consumption, is known as peaking power; and hydro plants are best able to furnish it. For, unlike electricity, the water behind the dam can be stored and used to turn the generators only when the need for electricity is greatest. Hence the owner of a steam plant can profitably afford to pay a premium price for peaking power—a price in excess of that at which he retails the energy to his own customers—as long as the cost of the peaking power is below what it would be if he chose the alternative of installing another generator.

Thus hydro power is at a competitive disadvantage if sold as firm power but brings a high return if sold as peaking power.

These facts were fully understood by the Corps of Engineers when it recommended that Congress authorize the multi-purpose dams from which SPA now derives its power. In estimating that the generating facilities at the dams would pay for themselves the Corps assumed that the electricity would be sold at the favorable prices commanded by peaking power. Hence when Congress appropriated funds for the construction of these dams it did so upon the assumption that the current would be sold as peaking power rather than as firm power. It is of course apparent that the decision to sell energy as peaking power involves at the same time the decision to sell at wholesale rather than at retail, since the retail consumer is not confronted with the problem of installing added generators.

Congress next expressed its views in the Flood Control Act of 1944, the basic law under which the Department of the Interior sells hydro power through its agent, SPA. Section 5 of that Act (16 USCA § 825s) reads:

"Electric power and energy generated at reservoir projects under the control of the Department of the Army and in the opinion of the Secretary of the Army not required in the operation of such projects shall be delivered to the Secretary of the Interior, who shall transmit and dispose of such power and energy in such manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles, the rate schedules to become effective upon confirmation and approval by the Federal Power Commission. Rate schedules shall be drawn having regard to the recovery (upon the basis of the application of such rate schedules to the capacity of the electric facilities of the projects) of the cost of producing and transmitting such electric energy, including the amortization of the capital investment allocated to power over a reasonable period of years. Preference in the sale of

such power shall be given to public bodies and cooperatives. The Secretary of the Interior is authorized, from funds to be appropriated by the Congress, to construct or acquire, by purchase or other agreement, only such transmission lines and related facilities as may be necesary in order to make the power and energy generated at said projects available in wholesale quantities for sale on fair and reasonable terms and conditions to facilities owned by the Federal Government, public bodies, cooperatives, and privately owned companies. All monies received from such sales shall be deposited in the Treasury of the United States as miscellaneous receipts."

It will be seen that this statute contemplates the sale of hydroelectric power only; that is, power "generated at reservoir projects." Further, the Secretary is authorized to construct or acquire *only* such transmission lines and related facilities as may be necessary to make the power available in *wholesale* quantities to specified purchasers. The language of this statute does not in any way suggest that Congress meant for the Department to "firm up" its hydro power by the acquisition of steam power and thereby enable itself to enter the competitive retail market. On the contrary, the legislative history of the Act, as reflected by Congressional committee reports, the debates on the floor, and the amendments that were accepted or rejected, shows beyond question that Congress was anxious to avoid setting up "a public power trust which would be unduly competitive with established private power utilities." Senate Report No. 1030, 78th Cong., 2d Sess.

Although the legislative branch of the national government had, in the two ways mentioned above, indicated its belief that federal hydro power should be sold as peaking power, the executive branch was of the opinion that this energy should be buttressed by steam-generated electricity and marketed as firm or base loading power. To this end the Department of the Interior submitted to Congress in 1946 a comprehensive plan for the expenditure over a period of years of $200,000,000 for the construction of steam plants. An initial appropriation of

$23,000,000 was requested for the year 1947. The House Appropriations Committee disapproved the request, and on the floor of the Senate the chairman of the Senate committee reported that it was the committee's judgment "that if the power was to be firmed up by steam plants it should be done by appropriate legislation . . . and not on an appropriation bill." Congressional Record, June 20, 1946, p. 7324. The requested appropriation was refused.

To this point the intention of Congress can hardly be said to be open to question. Arkansas Electric insists, however, that by the creation of what is known as SPA's "continuing fund" Congress has authorized SPA's participation in projects like the one now before us. This continuing fund can be understood only by an examination of its history.

In 1943, as part of the First National Defense Supplemental Appropriation Act, 57 Stat. 611, 621, Congress created the continuing fund. Having required that all receipts from the sale of power be paid into the Treasury, Congress provided working capital by directing the Secretary of the Treasury to set up and maintain from such receipts a continuing fund of $100,000 to enable SPA's Administrator "to defray emergency expenses and to insure continuous operation." Of course this language did not contemplate the acquisition of steam-generated power.

Next came the execution of what are called "wheeling" contracts. Prior to the making of these contracts SPA's hydro power had been sold as peaking power to private utilities. Yet § 5 of the Flood Control Act, quoted above, states that preference should be given to cooperatives and to public bodies. In its effort to carry out this mandate SPA proposed to construct its own transmission lines by which it could serve these preferred consumers, and under the statute it undoubtedly had authority for such construction. Private utilities opposed this move, and out of this controversy came the wheeling contracts, which were thought to be a satisfactory solution to the dispute.

A wheeling contract is simply an agreement that is intended to enable SPA to serve its preferred patrons by utilizing the transmission lines of a private company rather than by building duplicating lines of its own. The first wheeling contract was executed in 1947 between SPA and the Texas Power & Light Company. By that contract the company bought the entire output of SPA's 35,000 KW generator at the Denison dam. The company agreed, however, that if SPA should obtain contracts to supply preferred customers which the company could serve over its own lines the company would carry or "wheel" power to such customers, on behalf of SPA, to the extent of 20,000 KW hours. In other words, the company bought the 35,000 KW output but agreed to sell back to SPA up to 20,000 KW hours and to transmit that energy to SPA's preferred patrons. Other wheeling contracts were made with other private companies.

It will be seen that since under these contracts SPA became a purchaser as well as a seller, there was a possibility that it might need funds to meet its obligations. Upon this basis SPA in 1948 and 1949 asked Congress to increase the continuing fund to $300,000. This request was approved in 1950, the statute reading in part as follows: ". . . and said fund of $300,000 shall be placed to the credit of the Secretary and shall be subject to check by him to defray emergency expenses necessary to insure continuity of electric service and continuous operation of the facilities, and to cover all costs in connection with the purchase of electric power and energy and rentals for the use of facilities for the transmission and distribution of electric power and energy to public bodies, cooperatives, and privately owned companies." 16 USCA § 825s-1. It is this language on which Arkansas Electric relies in contending that Congress has empowered SPA to participate in the project now before us.

The wording of the statute is open to either of two interpretations. In authorizing the payment of costs in connection with "the purchase of electric power and energy and rentals for the use of facilities" for its trans-

mission, Congress may on the one hand have meant to enable SPA to perform its obligations under the wheeling contracts or, on the other hand, have meant to authorize the purchase of steam-generated power. The whole history of federal hydroelectric power leads us to think that the former interpretation is correct, and the legislative background of the 1950 amendment dispels all doubt. As originally introduced, this amendment would have permitted the continuing fund to be used to cover ''all costs in connection with the purchase of electric power and energy and rentals for the use of transmission lines and appurtenant facilities *of* public bodies, cooperatives, and privately owned companies.'' H. R. 3838. The italicized word ''of'' is of vital importance, since it might be construed to authorize exactly what is proposed in this case.

Senator Kerr offered an amendment to the bill, by which the word ''to'' was substituted for ''of,'' and in speaking in favor of this amendment Kerr said: ''The purpose of the clarifying amendment with reference to the continuing fund is to make it crystal clear that there is no purpose, desire, nor authority for the Administrator to rent any generating facilities with the money in the so-called continuing fund.'' Cong. Rec., 81st Cong., 1st Sess., p. 12,253. Kerr's amendment was adopted, and it was in that form that the bill became law. We need not prolong this opinion by quoting the many other excerpts from the Congressional Record that might be cited to show beyond question that Congress has invariably refused to permit SPA to enter the competitive retail market by firming up its hydro power with steam power.

In spite of this overwhelming evidence of the legislative intention Arkansas Electric contends that SPA is already purchasing steam-generated electricity under its wheeling contracts. In a sense this is true, since under such a contract the private company is not required to wheel to SPA's customer the identical current that the company received from SPA; it may substitute steam power of its own making and divert the hydro power to

some other consumer. But in principle this argument fails. Electricity is a fungible commodity which has the same characteristics whether it was created by the force of steam or the force of water. Under the Texas wheeling contract, for example, SPA may be called upon to supply the company with electric power to the extent of 35,000 KW, and SPA may in turn demand that its preferred customers be furnished with not more than 20,-000 KW of like energy. This arrangement is evidently a true exchange of power, since it obviously makes not the slightest difference to any one whether the current delivered by the company had its origin in a steam plant or in a hydro plant. The point is that SPA acquires no new source of energy under its wheeling contracts, since the private company sells back to SPA only a *part* of the volume that it receives from that agency. In the case at bar the situation is wholly dissimilar, involving not the mere exchange of current for that already available to SPA but the acquisition of steam power over and above the resources that SPA might otherwise have had at its disposal.

To sum up our discussion of the federal law: Congress has in no fewer than three ways expressed its belief that SPA's proper function is to sell hydro power in wholesale quantities rather than to sell at retail by the integration of steam power. First, the dams were originally approved upon the assumption that the current would be marketed as peaking power, which is necessarily a transaction at wholesale. Second, the Flood Control Act refers only to hydro power and specifically directs that the sales be in wholesale quantities. Third, when SPA proposed a comprehensive plan for the construction of steam plants Congress rejected the proposal. Opposed to this settled legislative policy is only the suggestion that by creating the continuing fund Congress meant to enable SPA to purchase steam-generated electricity and thereby to become a vendor of firm power. It is perfectly clear, however, that the appropriations to the continuing fund have been intended to permit SPA to perform its wheeling contracts and do not represent a departure from the policy implicit in the permanent

legislation. We are not convinced that Congress, by the approval of appropriation measures which are effective for only a year, has thereby decided to authorize the expenditure of the continuing fund for purposes completely at variance with the general laws.

We conclude that the SPA-Arkansas Electric contracts are contrary to federal law as well as to our own Act 342. The judgment of the circuit court is accordingly affirmed.

*Griffin Smith, C. J.,* concurs. *McFaddin, J.,* joins in the first ground for affirmance but thinks the majority's discussion of the federal law to be inappropriate.